# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 577 | **DATE** | 6/28/2002 |
| **CASE TITLE** | Johnstone, et al. vs. Wabick, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order denying defendants' motion for summary judgment. Pretrial order will be due by 7/31/02; and response to any motions in limine by 8/14/02. Pretrial conference set for 9/12/02 at 2:00 p.m. Trial set for 10/15/02 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 0 1 2002 date docketed | 72 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MPJ | courtroom deputy's initials | 02 JUN 28 PM 6:13 | date mailed notice | |
| | | date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERTS JOHNSTONE, derivatively )
on behalf of **TARRAGON REALTY** )
**INVESTORS, INC.**, a Nevada )
corporation, and **JOHN PEDJOE** )
derivatively on behalf of )
**TRANSCONTINENTAL REALTY** )
**INVESTORS, INC.**, a Nevada )
corporation, )
)
    Plaintiffs, )
)
    v. ) No. 01 C 0577
)
**DAVID J. WABICK**, an individual; )
and **PATRICIA WABICK**, an )
individual, )
)
    Defendants, and )
)
**TARRAGON REALTY INVESTORS,** )
**INC.**, a Nevada corporation, and )
**TRANSCONTINENTAL REALTY** )
**INVESTORS, INC.**, a Nevada )
corporation, )
)
    Nominal Defendants )

DOCKETED

JUL 0 1 200

## MEMORANDUM OPINION AND ORDER

David J. Wabick is a convicted felon. His guilty pleas for mail fraud and impeding the function of the Resolution Trust Corporation concern crimes that directly or indirectly relate to the civil law suit I consider here. The plaintiffs contend that, threatened with lawsuits, burdened with debt, and ultimately facing a $7 million fraud judgment, David Wabick fraudulently transferred to his wife Patricia Wabick various assets, including stock or

ownership interests in several firms he had started or acquired by or that she had acquired due to his efforts and not her own. Although virtually every issue of fact is in dispute, Mr. and Mrs. Wabick move for summary judgment on the grounds that the plaintiffs' claims are time barred and unsupported by evidence. I deny the motion.

I.

In June 1990, an Illinois corporation called Gateway Financial was formed. The defendants offer certain documents signed by Patricia Wabick identifying her as the "sole owner of record," Def. L.R. 56.1 Statement, Ex. 1, 3, 4. The plaintiffs contend that David Wabick was the sole owner of record, and submit in support the Record Book of the corporation produced in discovery, which so identifies him. Pl. L.R. 56.1 Statement, Ex. 1, at 13. This is an admission of a party-opponent. Mrs. Wabick testified that she gave a promissory note in a nominal amount as consideration for the purchase of Gateway Financial's shares. The note is not offered in evidence.

The defendants say that David Heyes was hired to run the day-to-day operations of Gateway Financial. There is some evidence that supports this, see Pl. Ex. D at 38 (Mr. Wabick states that Heyes "was hired to run the company full time."), but there is also evidence to the contrary. The "Gateway Companies" self-description states that Mr. Wabick was a "Principal" and "responsible for their

-2-

operation," while Heyes was described as being "responsible for property sales . . . and is in charge of the hotel, office, and retail properties" for Gateway Financial. Pl. Ex. B at 4-5.

Mr. Wabick stated in his deposition that he began working for Gateway Financial beginning in or about 1991. The plaintiffs dispute this as evasive in view of the cited evidence indicating that his involvement was closer than that suggests, and indeed the deposition testimony is not specific about when he "started working" for Gateway Financial. Def. Ex. 7, at 9. After Mr. Wabick began working for Gateway Financial, Mr. Wabick undisputedly received a salary of $75,000 a year. Mr. Wabick denied under oath that he ever had an ownership interest in Gateway Financial, stating that it was owned by Mrs. Wabick. Def. Ex. 8, at 9-11. However, as noted, the evidence from the Record Book indicates otherwise.

Gateway Capital was formed in June 1992. The defendants state that Patricia Wabick owned 50 shares of Gateway Capital. The plaintiffs do not dispute this, although they contend that David Wabick caused the shares to be issued to her after he formed the company, see Pl. Ex. R, at ¶ 8.a, and they offer evidence that Mr. Wabick claimed a financial interest in Gateway Capital through 1995, see Pl. Ex. F at 3, G at 1, H at 1. The defendants claim that Mrs. Wabick also gave a promissory note in a nominal amount as consideration for her Gateway Capital shares, which note is not offered in evidence. Mrs. Wabick testified that she "invested" in

-3-

Gateway Capital by signing a note, although she could not remember the amount or the holder of the instrument. Pl. Ex. C, at 55-56, 64. According to the defendants, the other 50% of Gateway Capital stock was owned by Larry and Jane Ettner, and this is not disputed. Neither is it disputed that Larry Ettner and David Wabick ran the day-to-day operations of Gateway Capital, nor that Mr. Wabick received a salary of $150,000 a year from the firm. Mr. Wabick denies ever owning any shares of Gateway Capital, but a rational jury could believe that this was not true on the strength of his personal financial statements through 1995, where he said that he had a substantial ownership interest in this firm. Pl. Exs. F-H.

Mr. Wabick testified that in 1990-1993 he was solvent and had millions in assets, Def. Ex. 7 at 165, Exs. 15, 16. The plaintiffs point out that a jury might doubt this because the financial statements on which Mr. Wabick relies are unaudited, and do not reflect various liabilities, including a $2,000,000 loan from Gateway Financial, Pl. Ex. O, and lawsuits relating to Connaught, a company he controlled, Pl. Ex. V, and the misdeeds of which were connected to one of his convictions. The plaintiffs say that a rational jury might infer that Mr. Wabick was actually insolvent or that his insolvency was imminent as early as 1990. Mr. Wabick asserts that his assets lost considerable value between 1993 and 1997, and that by 1996, he had no assets and was actually being supported by his wife. At his deposition, however, he testified that

-4-

he was financially solid through 1994, and was making a good salary until 1997, when he "really got nailed." Def. Ex. 7, at 162. He resigned as an officer and director but under an agreement of April 1997, he was retained by the Gateway groups as a consultant at a remuneration of $157,000 a year Pl. Ex. W at 6.

The plaintiffs sued Wabick and First Bank in 1995, *Johnstone v. First Bank*, 95 C 2008 (N.D. Ill.). It is undisputed that in 1996, plaintiffs were advised that Mr. Wabick had no assets and were asked to consider dismissing him from the lawsuit. There was a similar exchange in 1997. In 1999, Mr. Wabick stipulated to entry of a default judgment against him in the amount of $7,040,000.

The defendants assert that, in connection with a bankruptcy case filed in 1996, *In re Janesville Assocs*, 96 B 52713 (Bankr. N.D. Ill.), Mrs. Wabick purchased the Janesville, Wisconsin, Best Western Hotel. However, the evidence they offer for this is Mr. Wabick's testimony, which is that *he*, Mr. Wabick, took a 75% interest in the hotel, and that Heyes took the other 25%. Def. Ex. 7 at 80. Mr. Wabick denies that he transferred an ownership interest in the Janesville Best Western to Mrs. Wabick. In his answer to the plaintiff's complaint, however, he states that Mrs. Wabick somehow acquired an interest in the hotel at least partially through his efforts. Pl. Ex. CC ¶ 20. The defendants state that Mrs. Wabick also acquired an interest in Great Lakes Imaging, L.L.C., which runs various Magnetic Resonance Imaging ("MRI") centers. *Id.* Mr.

-5-

Wabick's answer also admitted that Mrs. Wabick acquired her interests in the MRI center at least partially through Mr. Wabick. A marginal note following this statement addressed to "Barry," apparently Barry Freeman, Mr. Wabick's attorney, says "[Barry, is this right? We admit that she acquired the interests through the efforts and activities or (sic) Dave? If so, what are we denying? Can we say she acquired them partially through his efforts?]," is further evidence tying Mrs. Wabick's interests in these properties to Mr. Wabick.

In 1999, Mr. Wabick pleaded guilty to mail fraud and to impeding the functions of the Resolution Trust Corporation ("RTC"). The "impeding" conviction involved an admission that Mr. Wabick lied to the RTC about Gateway Capital's eligibility to bid on certain loans being sold at auction by the RTC. Pl. Ex. R at 4. He was sentenced to 22 months in prison for the mail fraud charge, and to six months for the impeding charge, sentences to run concurrently. Pl. Exs. S and U.

II.

In deciding a summary judgment motion, I "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000). Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The defendants argue that plaintiffs' fraudulent transfer claims regarding Gateway Financial and Gateway Capital are time-barred. The Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1. Section 10 of the Act, which sets forth the time period in which a claim for relief must be brought, provides that a cause of action under the statute must be brought "within 4 years after the transfer was made . . . or, if later, within one year after the transfer . . . was or could reasonably have been discovered by the claimant." 740 ILCS 160/10(a). The defendants argue that the relevant triggering events were the acts whereby Mrs. Wabick invested in Gateway Financial and Gateway Capital. Mrs. Wabick, they say, had 100% of the stock of Gateway Financial on its inception in 1990, and 50% of the stock of Gateway Capital from its formation in 1992. Since the plaintiffs sued in 2001, they must proceed under the "discovery" clause. Illinois uses a reasonable person standard for discovery for the purposes of a fraud claim. *See Knox College v. Celotex Corp.*, 430 N.E. 2d 976, 980-81 (Ill. 1981). The defendants rely on the undisputed fact that during the *First Bank* litigation in 1996 and again in 1997, the plaintiffs were informed that Mr. Wabick had no assets and that Mrs. Wabick owned the family assets. The defendants argue that, for this reason, a reasonable person would have been on notice that Mr. Wabick was broke, and the statute

-7-

of limitations started to run at that point and expired in 2000, the year before they sued.

The determination of when the statute of limitations begins to run "is ordinarily a question of fact for the jury." *In re Apex Automotive Warehouse, L.P.*, Nos. 96 B 04594, 96 B 04596, 96 A 1123, 99 C 2537, 2000 WL 220497, at *5 (N.D. Ill. Feb. 18, 2000) (citing *Witherell v. Weimer*, 421 N.E.2d 869, 874 (Ill. 1981)). The statement in question about the ownership of assets would not by itself alert a reasonable person to the possibility of a fraudulent transfer. In the context of Mr. Wabick's repeated assertions that he never owned any interest in these firms, the statement offered to show that the plaintiffs should have been on notice, would in fact allay any such suspicions. To show that a reasonable plaintiff would have been alerted to a possible fraudulent transfer, the defendants would have to show that in 1996, when the statement about his financial condition was made, the plaintiffs had reason to believe that Mr. Wabick had had an ownership interest in the Gateway companies to transfer, *i.e.*, that he was lying when he denied it then. The defendants have not offered such evidence. A jury could conclude that the plaintiffs had no reasonable belief that there was funny business going on until well within the statute of limitations.

Read literally, a discovery rule does not apply to the plaintiff's claims under sections 5(a)(2) or (6). Those provisions impose a four year statute of limitations for claims under § 5(a)(2)

and 6(a), and a one year rule under 6(b), with no discovery period.[1] However, the defendants waive this argument by stating that the discovery rule applies to all the plaintiffs' claims.

Moreover, the plaintiffs argue plausibly that if David Wabick caused the statute of limitations to run by lying to them about the ownership of the assets in question, the defendants are estopped from asserting the defense of the statute of limitations. The Illinois courts have said that a party may be equitably estopped from asserting the statute of limitations "where it would be unjust to permit the litigant to disavow express and implied statements upon which another party has relied and which have caused him to forgo filing his suit." *Smith v. Cook County Hosp.*, 518 N.E.2d 336, 342 (Ill. App. Ct. 1987):

> Basically, the theory provides that a defendant cannot benefit from his own misconduct. However, the plaintiff cannot show

---

[1] The relevant provision reads in full:

§ 10. A cause of action with respect to a fraudulent transfer or obligation under this Act is extinguished unless action is brought:
  (a) under paragraph (1) of subsection (a) of Section 5, within 4 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
  (b) under paragraph (2) of subsection (a) of Section 5 or subsection (a) of Section 6, within 4 years after the transfer was made or the obligation was incurred; or
  (c) under subsection (b) of Section 6, within one year after the transfer was made or the obligation was incurred.

740 ILCS 160/10.

> mere misconduct, but must be able to show that the defendant
> said or did something to lull or induce the plaintiff to delay
> the filing of his claim until after the limitations period has
> run.

*Id.* Nor does estoppel require a lie. A defendant "is estopped from asserting a statute of limitations if the plaintiff's failure to act within the statutory period results from reasonable reliance on the defendant's conduct or representations." *Dever v. Simmons*, 684 N.E.2d 997, 1001 (Ill. App. Ct. 1997) (citing *Witherell v. Weimer*, 515 N.E.2d 68 (Ill. 1987)). "An intent to mislead, deceive, or delay is not necessary." *Id.* Here, the jury could conclude that the defendants' statements caused the plaintiffs reasonably not to act within the statutory period, and, moreover that Mr. Wabick lied to them, and so may not profit by his own wrong. I deny summary judgment under the statute of limitations on the claims involving the Gateway companies. The parties may argue the statute of limitations at trial, but if the jury believes that Mr. Wabick lied or otherwise caused the plaintiffs to allow the statute of limitations to run, then as a matter of Illinois law the statute of limitations defense would be estopped.

### III.

There is no evidence to support the plaintiffs' section 5 claim,[2] the Wabicks contend, because there is no evidence that Mr.

---

[2] The provision states:

> A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim

-10-

Wabick ever transferred any assets to his wife. The statute requires that the debtor have an interest in the property transferred, see 740 ILCS 160/7(d), but the undisputed evidence (they say) is that Mr. Wabick had no interests in the property at issue. As noted, with respect to Gateway Financial, Gateway Capital, and the Janesville Best Western, this is not so. On the contrary, the Record Book identifies Gateway Financial as solely owned by Mr. Wabick, and he claimed an interest in Gateway Capital in his financial statements through 1995. He stated in his deposition that he acquired a 75% interest in the Janesville Best Western. The only asset at issue where there is any question is Great Lakes Imaging (the MRI centers). Here the Wabicks' Answer admits that Mrs. Wabick acquired her interest in the centers through or partly through the efforts of Mr. Wabick. This poses at least a material issue of fact as to whether there was a transfer. The statute defines "transfer" in very broad terms: "'[t]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes

---

arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
  (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
  (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . .

740 ILCS 160/5(a).

-11-

payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(l). Except for insolvency, discussed below, the defendants do not dispute the other "badges of fraud," *id.* § 160/5(b) (including transfer to an insider, retention of control over assets, purported transfers involving substantially all of defendant's assets).

Section 6 of the Fraudulent Transfer Act requires that "the debtor [have] made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time. . . ." 740 ILCS 160/6(a). The defendants argue that there is insufficient evidence to conclude that Mr. Wabick was insolvent at the time of his purported fraudulent transfers because he testifies that he was worth "millions" and making a good salary. However, the plaintiffs offer evidence that Mr. Wabick's financial statements failed to report a two million dollar liability loan in the form of a loan from Gateway Financial, and that he faced legal problems at the time of Gateway Financial's inception, *see, e.g.*, Pl. Ex. R ¶ 8(d) and (g) (indicating, *e.g.*, that a Connaught loan of $1.65 million personally guaranteed by Mr. Wabick was in default in January 1990).

The defendants contend, further, that the section 6 claims must fail because the plaintiffs must have been creditors at the time of the transfers, 740 ILCS 160/6 (a) ("A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the

-12-

transfer was made . . . ."), but were not. They argue that the plaintiffs did not sue until 1995, and nothing in the record supports an earlier indebtedness. This is rather perverse; indeed, the 1995 lawsuit, in which Mr. Wabick stipulated to a default judgment of more than $7 million in the *First Bank* case, precisely concerned earlier events, some involving a fraud dating back at least to 1991. A jury could find that transfers at least from then on are actionable.

IV.

The defendants' motion for summary judgment is DENIED.

ENTER ORDER:

*Elaine E. Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated:    June 28, 2002